Anne Davis v. Commissioner.
Davis v. Commissioner
Docket No. 88927.
United States Tax Court
T.C. Memo 1964-244; 1964 Tax Ct. Memo LEXIS 92; 23 T.C.M. (CCH) 1449; T.C.M. (RIA) 64244; September 18, 1964
*92 Petitioner is the daughter of the transferor, David J. Pleason. On May 20, 1954, this Court held him liable for deficiencies in income tax and additions to tax for fraud for 1943 and 1944 in the aggregate amount of $282,296.03. In an effort to collect these taxes during 1955 through 1959, inclusive, the Government filed a series of tax liens against Pleason, encountering little success. On December 2, 1955, Pleason executed a contract with Kent Shrimp Company to purchase a shrimp boat for $31,000, payable in installments. Ownership of the vessel was registered in the name of Kent with the United States Bureau of Customs in Tampa, Florida, the home port of the vessel. In August 1956, in connection with an offer in compromise made to the Government, Pleason swore that he was unable to satisfy his unpaid income tax liabilities and was insolvent. On February 4, 1959, a Notice of Federal Tax Lien was filed against him in Florida regarding his property interest as purchaser of the vessel. On February 12, 1959, a Notice of Levy was served on petitioner with respect to all property or property rights belonging to her father in her possession. On January 12, 1959, Pleason requested Kent to *93 give him the bill of sale agreed to under the aforesaid contract. Pursuant to the terms of said contract a bill of sale dated February 15, 1959, was prepared, but it was not executed until March 2, 1959. No reference to the aforesaid contract was made in the bill of sale, and title to the vessel was conveyed exclusively to petitioner. She executed a promissory note dated February 15, 1959, payable to Kent in the sum of $10,594.08, representing the balance due by the transferor under the contract of purchase. Petitioner concedes that she acquired the vessel on February 15, 1959, three days after a Notice of Levy had been served on her by the Government. On March 5, 1959, petitioner executed a contract of sale with E. J. Williams, the captain of said vessel, for $27,500. A marine insurance policy on the vessel for the period December 1, 1958, through December 1, 1959, was issued in the face amount of $30,000. Respondent conceded that the transferee's liability is limited to $16,905.92, the value of the transferor's beneficial interest in the vessel. 1. Held: Respondent has established that petitioner is liable as a transferee to the extent of transferor's beneficial interest in the *94 vessel conveyed to her in the amount of $16,905.92, together with interest thereon as prescribed by Texas law, from the date of transfer, February 15, 1959. 2. Held: The statute of limitations does not bar assessment against the transferee since the transferor's returns for 1943 and 1944 were false and fraudulent with the intent to evade tax and suspension of the statute of limitations against the transferor works a suspension of the statute as to the transferee. Sec. 276, I.R.C. 1939. 3. Held: Since jurisdiction of this Court in transferee liability cases is concerned exclusively with the secondary liability of the transferee for taxes of the transferor, petitioner is not entitled to a setoff with respect to an overpayment of her individual income taxes in the amount of $49,884.93, for the fiscal years ending November 30, 1942, and 1944, which years are not before us. Maurice J. Walsh, 105 W. Adams St., Chicago, Ill., for the petitioner. Jay B. Kelly, for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined that petitioner is liable as a transferee of the assets of David J. Pleason to the extent of $27,500, such liability being the fair market value of a boat caused to be transferred to her by Pleason on February 15, 1959. The issues presented for our consideration are: (1) Whether petitioner is liable as transferee of the O/S Doctor Walling to the extent of the transferor's *97 beneficial interest therein under section 6901 of the 1954 Code; and, if so, the value of said interest; (2) whether interest upon the transfer in question is chargeable to petitioner from the date of transfer, February 15, 1959, or from June 10, 1960, the date the notice of deficiency of transferee liability was issued; (3) whether or not the statute of limitations bars assessment of the transferee liability involved herein and (4) whether petitioner is entitled to a setoff because of an overpayment of her personal income taxes for the fiscal years ending November 30, 1942, and November 30, 1944. Findings of Fact The facts are partly stipulated, together with certain exhibits attached, and to the extent so stipulated are incorporated herein by reference. Anne Davis, hereinafter sometimes referred to as petitioner, resides at 7932 Chappel Avenue, Chicago, Illinois. Petitioner and her husband, Sheldon R. Davis, filed their joint Federal income tax return for the taxable year 1959 with the district director of internal revenue in Chicago, Illinois. Petitioner is the daughter of David J. Pleason (sometimes called the transferor). Pleason resides in Brownsville, Texas. On June 10, 1960, respondent *98 mailed to Anne Davis a statutory notice of deficiency in which it was determined that she was liable as a transferee of assets of David J. Pleason. The statutory notice contained the following explanation of said liability: It is determined pursuant to the provisions of section 6901 of the Internal Revenue Code of 1954, that the amount stated herein represents your liability at law or in equity, as transferee of the assets of David J. Pleason, 232 Sunset Drive, Brownsville, Texas, for the deficiencies in income taxes of $231,430.54 and $50,865.49 due from David J. Pleason for the years 1943 and 1944, respectively. Your total liability as transferee of the assets of David J. Pleason is limited to $27,500.00, such liability being the fair market value of the boat "Doctor Walling" received by you from David J. Pleason for no valuable consideration. The transfer of the boat "Doctor Walling" by David J. Pleason to you was made at a time when David J. Pleason was insolvent, or rendered insolvent by said transfer to you. * * *
Respondent, at the trial, conceded that the transferee's liability is limited to $16,905.92, the now alleged value of the transferor's *99 beneficial interest in the O/S Doctor Walling. Pleason's deficiencies in income taxes with additions to the tax due to fraud with intent to evade tax for the taxable years 1943 and 1944, in the amounts of $231,430.54 and $50,865.49, respectively, were determined by this Court on May 20, 1954, in the case reported as David J. Pleason, 22 T.C. 361 (1954), affd. 226 F. 2d 732 (C.A. 7, 1955), certiorari denied 350 U.S. 1006 (1956). Pleason's income tax deficiencies and additions to tax for 1943 and 1944 were assessed on February 4, 1955. A Notice and Demand for Payment was mailed to him on February 15, 1955. A Notice of Federal Tax Lien in the amount of $291,336.72 was filed with the office of the Cook County Recorder of Deeds, Chicago, Illinois, on June 21, 1955. On November 30, 1955, Pleason entered into a written contract with Kent Shrimp Company, a corporation, incorporated under the laws of Florida (hereinafter sometimes called Kent) regarding the sale of a shrimp boat called the O/S Doctor Walling. Kent agreed to sell the vessel to Pleason for the sum of $31,000, payable $1,500 in cash and the balance of $29,500, without interest, *100 payable out of 25 percent of the established price from shrimp produced by the vessel. The sums so paid were to be credited against the unpaid purchase price. Kent also agreed that upon payment of 60 percent of the purchase price it would deliver a bill of sale to Pleason for the vessel free and clear of any liens, whereupon Pleason would execute a first preferred ship mortgage on the vessel securing the payment to Kent for the unpaid portion of the deferred purchase price. Pleason also agreed to keep the vessel insured against marine and other risks for an amount at least equal to the full commercial value of the vessel and in no event less than the unpaid balance of the consideration. All losses under the insurance policies were to be payable for the benefit of Pleason and Kent as their interests may appear. The parties agreed to change the registered home port of the vessel from Tampa, Florida, to Brownsville, Texas, upon the payment of 60 percent of the purchase price, by requesting the Collector of Customs in Brownsville, Texas, to issue the registration to Pleason, subject to the first preferred ship mortgage in Kent's favor. The O/S Doctor Walling was described as an oil *101 screw or vessel, Official No. 264567, of Tampa, Florida. It was built in Florida in 1952 of wood construction with an over-all length of 68 feet, depth of 7.6 feet and width of 18.8 feet. Its registered tonnage was 59.71 gross and 27 net tons. The records of Kent show the down payment of $1,500 on December 12, 1955, and receipt of various checks by it were credited to the account of Webb and Pleason. By December 26, 1958, Kent's record of the unpaid balance was $10,094.29. Pleason actually owed $10,594.29 as of December 26, 1958. The discrepancy of $500 is due to payments received by Kent from sources other than Pleason which were credited to Pleason's account. Payments numbered 1 through 56, covering the period from December 2, 1955, through December 26, 1958, are denominated as "25% liquidation" payments from Pleason and L. Webb. Petitioner's first payment appears on March 13, 1959, and her last payment to Kent Shrimp Company on June 19, 1959, when petitioner's note and mortgage were sold to one Russell L. Miller of Kent, Ohio. Laurent Webb was an accountant who managed the accounts for the O/S Doctor Walling in behalf of Pleason. The ownership of the O/S Doctor Walling was registered *102 with the United States Bureau of Customs, Tampa, Florida, in the name of Kent. A Statement of Financial Condition was furnished to the Internal Revenue Service by David J. Pleason on August 6, 1956, in connection with an offer in compromise. In the documents, Pleason swore that he was unable to satisfy his unpaid income tax liabilities and that if called to testify he would state that from and after August 6, 1956, and at all times material to this proceeding he was insolvent. On November 29, 1957, Pleason was notified by respondent that his offer in compromise regarding said income tax liabilities for the taxable years 1943 and 1944 was rejected. On May 22, 1957, a Notice of Federal Tax Lien in the amount of $286,475.23 was filed with the Office of the Recorder of Deeds, Cameron County, Brownsville, Texas. On January 27, 1959, a Notice of Levy in the amount of $354,314.85 was served on the First National Bank of Brownsville, Brownsville, Texas. The levy notified the bank, inter alia, as follows: You are further notified that all sums of money or other obligation owing from you to account of "Doctor Walling, Boat Account", as his interest may appear therein, are hereby levied *103 upon for satisfaction of the aforesaid tax. Said levy produced the amount of $4,179.20 which sum was credited to the tax account of Pleason on June 8, 1959. On February 4, 1959, a Notice of Federal Tax Lien in the amount of $296,475.23 was filed with the Clerk of the Circuit Court, Hillsborough County, Florida, regarding the interest of Pleason as purchaser of the O/S Doctor Walling. On February 12, 1959, a Notice of Levy was served on Anne Davis. On February 24, 1959, a Final Demand was served on her for the amount of $354,314.85 with regard to "all property, rights to property, moneys, credits and bank deposits then in your possession, to the credit of, belonging to, or owned by David J. Pleason * * *." On March 6, 1959, a Notice of Levy was served on the Brownsville Shrimp Exchange, Brownsville, Texas, in the amount of $350,135.65 with respect to the tax liabilities of Pleason. On January 12, 1959, Pleason wrote to Kent requesting that the balance then due on the O/S Doctor Walling of $10,594.29 be repaid under a new arrangement of 35 or 36 equal monthly payments. Pleason also requested the bill of sale agreed to under his contract with Kent. After a further exchange *104 of correspondence between Kent and Pleason and/or Laurent Webb, Kent agreed to the proposal contained in Pleason's letter of January 12, 1959. According to the new agreement Pleason's lawyers were to prepare the bill of sale and preferred ship mortgage. On March 2, 1959, a resolution of the board of directors of Kent was passed authorizing its president to execute the bill of sale of the O/S Doctor Walling. The resolution is as follows: RESOLUTION Whereas, Kent Shrimp Company, a private corporation incorporated under the laws of the State of Florida, with offices at Nokomis, Florida, is sole owner of an oil screw or vessel called the O/S DOCTOR WALLING of approximately twenty-seven (27) tons, official No. 264567; Whereas, Kent Shrimp Company has entered into a contract to sell the said vessel to David J. Pleason, Buyer, of Brownsville, Cameron County, Texas, after being duly authorized by its Board of Directors, which contract was executed November 30, 1955; Whereas, that under the terms and conditions of said contract which said Buyer has performed, the Kent Shrimp Company is now obligated to execute a Bill of Sale to said Buyer and otherwise complete and perform the terms *105 and conditions of said contract; Now, THEREFORE, be it resolved by the Board of Directors of Kent Shrimp Company, all members therein concurring, that its President, C. R. Renouf, and/or its Treasurer, Russell L. Miller, officers of Kent Shrimp Company be and are hereby authorized to execute the necessary Bill of Sale to transfer said vessel to the Buyer, or the Buyer's appointee and to execute all papers and documents necessary to effect such sale and transfer of the O/S DOCTOR WALLING vessel, and to do everything necessary and incidental thereto. Dated at Kent, Ohio, this 2nd day of March, 1959. * * *
Pursuant to the agreement of Kent and Pleason, a bill of sale dated February 15, 1959, was prepared, but it was not executed until March 2, 1959, by C. R. Renouf, president of Kent. The bill of sale provides, inter alia: for and in consideration of the sum of Thirty-one Thousand and no/100 dollars, * * * bargained and sold, * * * the herein described vessel * * * unto the said Anne Davis, of Chicago, Illinois, sole owner ( hereinafter called the (buyers)), her executors, administrators, successors and assigns * * *. The bill of sale makes no reference to the contract between *106 Kent and Pleason with regard to the vessel nd Pleason's name does not appear in the chain of title. Commencing in 1959, the records of Kent show that payments received by Kent on the vessel were made by Anne Davis. Petitioner's first payment was entered on Kent's records on March 13, 1959, and her last payment to Kent was made on June 19, 1959. By letter dated April 15, 1959, Pleason notified the Office of the Deputy Collector of Customs, Brownsville, Texas, that several months prior to this date, for financial reasons, he had relinquished his interest in the vessel, O/S Doctor Walling, acquired under his contract of purchase and sale with the Kent Shrimp Company, and that this interest was acquired by Anne Davis. The transferor relinquished all control over the management of the O/S Doctor Walling from and after February 15, 1959, and he transferred his interest in said vessel on that date to petitioner. Petitioner averred that she acquired the O/S Doctor Walling on February 15, 1959, and that Pleason relinquished all control of the vessel from and after that date to her. The petitioner executed an affidavit on April 7, 1959, stating she was the sole owner of the O/S Doctor *107 Walling. Also in May 1959, Anne Davis executed certain papers and affidavits wherein she stated she was the sole owner of the shrimp boat. Petitioner wrote two checks payable to the order of David J. Pleason in the amounts of $2,500 and $1,000 dated December 15, 1958, and January 10, 1959, respectively. Said checks were endorsed as follows: "David J. Pleason To deposit to Boat 'Dr. Walling, L. Webb Acct.'" After deposit, the amounts represented by these checks were seized under levy by the United States. The checks had been drawn on the account of Sheldon R. Davis or Anne Davis at the South Shore National Bank of Chicago, Illinois. Two checks in the amounts of $2,000 and $1,000, dated January 29, 1959, and March 10, 1960, respectively, were drawn on her account with the South Shore National Bank of Chicago as replacements for the former checks. These latter checks were drawn payable to the order of David J. Pleason and were endorsed "David J. Pleason." On February 20, 1959, petitioner executed the first preferred mortgage on the O/S Doctor Walling, and a promissory note payable to Kent in the amount of $10,594.08 to cover the unpaid balance due on the transferor's contract of *108 purchase. The terms of the mortgage required that petitioner keep the vessel fully insured under usual full marine insurance with a policy valuation not exceeding the amount insured and at least in an amount equal to the unpaid balance of the mortgage. The terms of the mortgage required payment of principal in 36 consecutive monthly installments with the first payment due March 15, 1959. On February 20, 1959, petitioner entered into a contract of sale of the shrimp boat with E. J. Williams (hereinafter called Williams) of Brownsville, Texas. The contract was executed by Williams on March 5, 1959. Under the terms of the contract, petitioner agreed to sell the vessel to Williams for the sum of $27,500, payable $3,000 in cash at the time of the execution of the contract, and the balance of $24,500, together with interest at 6 percent per annum, payable out of 25 percent of the established price orf shrimp produced by the vessel. Williams was to submit a statement prepared by Laurent Webb at the conclusion of each trip showing the amount received and the disbursement of all sums derived from the sale of shrimp produced by the vessel. Webb, an accountant who had been appointed by Anne *109 Davis to act as her agent with regard to the accounts of the vessel, was designated as the party to keep an account of the payments. The contract further provided that Webb shall countersign all checks drawn by Williams and supervise the disbursement of all sums derived from the shrimp produced by the vessel. Petitioner empowered Webb to act as her managing agent with respect to the operation of the vessel. Webb served in the same capacity for the transferor. With respect to insurance coverage in the aforesaid contract, the buyer agreed to keep the vessel fully insured. E. J. Williams of Brownsville, Texas, the purchaser of the O/S Doctor Walling, was the captain of the vessel, and earned his livelihood from its operation. Petitioner is not related to Williams. Petitioner on her joint Federal income tax return filed for the taxable year 1959 reported a gain on the sale of the vessel in the amount of $1,465.74. Also, she reported receiving the down payment on the vessel in the amount of $3,000; that the gross sales price was $27,500 and as "cost or other basis" she reported the amount of $14,500. Petitioner had been manager of a ladies shop for two years at the time of the instant *110 trial. She had been employed as a saleswoman in that business from time to time for about 12 years. At the time of trial, petitioner's husband was a sheet metal instructor in a trade school with the Board of Education in Chicago, Illinois. On June 1, 1959, Kent assigned the first preferred ship mortgage executed by Anne Davis to Russell L. Miller. In accordance with the custom and practice of the commercial phase of the wet marine insurance business, a "condition and valuation survey" on a vessel was made prior to issuing a policy of insurance. With respect to the O/S Doctor Walling, it was appraised on November 19, 1958, for the purpose of ascertaining her general condition and, for marine insurance purposes, an estimate of her then market value was found to be $30,000, an amount stipulated and agreed upon between Pleason and the marine underwriters. A policy was issued on the vessel in the face amount of $30,000 for the period December 1, 1958, through December 1, 1959. On November 5, 1959, the vessel was again appraised for marine insurance purposes and the appraisal indicated her then fair market value to be $25,000. A policy in the face amount of $25,000 was issued for the *111 period December 1, 1959, to December 1, 1960, by Great American Insurance Company, hereinafter called Insurance. On March 5, 1959, an endorsement to the policy of insurance noting that the named assured is changed to E. J. Williams and the loss payees instead of the transferor and Kent Shrimp Company, included Anne Davis' name and her buyer, E. J. Williams, as the assured. About February 3, 1960, the shrimp boat ran aground on the Texas coast in the vicinity of Arkansas Pass, Texas. Efforts to salvage her were unsuccessful. Anne Davis, Williams and Russell L. Miller joined together in a libel suit in Admiralty against Insurance. The libelants alleged damages in the amount of $35,000, which consisted of a claim of $25,000 for the total loss of the vessel and an additional $10,000 under a "sue and labor provision" of the insurance policy. In the complaint, Williams and Anne Davis were described as owners of an interest in the vessel. Also, petitioner averred that the terms of the policy stipulated and agreed that the vessel was valued at the sum of $25,000 for the purpose of insuring it. She alleged that the vessel "was in a seaworthy condition." Insurance, as a result of the libel *112 in Admiralty, paid the amount of $25,000 the face amount of the insurance coverage on the vessel. After the direct payment of certain claims against Williams, Insurance mailed a check payable to Williams, Anne Davis and Russell L. Miller about April 26, 1961, for the remainder of the judgment. Petitioner received a share of the proceeds paid on the loss by Insurance. Petitioner retained the proceeds of the sale of the vessel and, ultimately, her share of the proceeds of the insurance paid on the loss claim filed on the vessel. On May 22, 1961, a Satisfaction of Mortgage was filed with the Collector of Customs, Brownsville, Texas, by Russell L. Miller, discharging Anne Davis of the existing indenture. On September 29, 1961, the United States District Court for the Northern District of Illinois (during the course of the proceedings entitled United States v. Anne Davis and David J. Pleason, No. 59 C 1646, which related to certain bearer debenture bonds in the amount of $75,000 of the Brownsville Shrimp Exchange, Inc., of Brownsville, Texas) entered a Judgment Order which decreed that a judgment be entered for the plaintiff, United States of America, and against the defendant, David *113 J. Pleason, in the amount of $395,966.72, plus statutory interest as provided by law. In this action respondent reduced the transferor's unpaid tax liabilities to judgment and established his lien for delinquent income taxes due and owing from David J. Pleason. Anne Davis' income taxes for the fiscal years ended November 30, 1942, 1943 and 1944, were paid with funds withdrawn from the Royal Distillers Products bank account in the Security National Bank, Cairo, Illinois. See David J. Pleason, 22 T.C. 361, 367 (1954). A letter dated March 29, 1951, from Springfield, Illinois, Office of the Revenue Agent in Charge, notified petitioner that certain adjustments seemed warranted with respect to her returns filed for the fiscal years ended November 30, 1942 and 1944, respectively. The adjustments resulted in a total overassessment of $49,884.93. Petitioner was requested to sign an enclosed acceptance form, if she agreed. Petitioner also could file a protest with respect to the proposed adjustments. In the event she neither accepted nor protested the proposed adjustments, the letter recited that the issuance of a certificate of overassessment would be "recommended." Petitioner *114 did nothing with repect to this letter and the respondent did not issue a certificate of overassessment with respect to said adjustments. Ultimate Findings of Fact The fair market value of the O/S Doctor Walling at the time of transfer to petitioner on February 15, 1959, was $27,500. Pleason at that time had an equitable interest in the vessel in the amount of $16,905.92. Anne Davis received from the transferor his beneficial interest in the vessel for no consideration. At the time of the transfer the transferor was insolvent and had an outstanding assessment against him for unpaid Federal taxes, additions to tax, and interest far in excess of the value of the property here involved, which liabilities were known to petitioner who also had knowledge of the fact that the transfer to her was a fraud on the creditors of the transferor. Opinion Issue 1. Transferee Liability. The primary issue for decision is the liability of petitioner, Anne Davis, as a transferee with respect to David J. Pleason's unpaid income tax deficiencies and additions to the tax and interest accrued thereon for the taxable years 1943 and 1944 to the extent of his interest in the O/S Doctor Walling, *115 a shrimp boat, transferred to her in 1959. In essence, respondent contends that petitioner's father, David J. Pleason, transferred his beneficial interest in a shrimp boat to her for no consideration or less than adequate consideration at a time when the transferor was insolvent; that said transfer was a fraud on the creditors of the transferor, including respondent, under local state law, and, accordingly, that the petitioner herein is liable as a transferee under the pertinent provisions of section 6901, [1] Code of 1954. Respondent also claims interest on the deficiency running from February 15, 1959, the date of transfer of the boat to petitioner, pursuant to Texas law. *116 Contesting respondent's determination, petitioner contends that by the assumption of certain pecuniary liabilities incurred by the vessel in question, a fair and ample consideration was paid by her to secure the bona fide transfer of the vessel from Kent Shrimpp Company. Petitioner denies that Pleason had a valuable beneficial interest in the vessel and leaves respondent to his statutory burden of proof to establish the value of the interest allegedly transferred to her. Section 6902[2] of the 1954 Code. Further, petitioner avers that the statute of limitations bars any claim against her, but, that if she is found liable as a transferee, she is entitled to a setoff against the transferee liability by reason of a determination of an overpayment of $49,884.93 in her personal income taxes in 1942 and 1944. *117 For reasons hereinafter discussed, we find petitioner's contentions without merit. Respondent has the burden of proving liability of the taxpayer as a transferee, i.e., he must establish all facts necessary to show liability, at law or in equity, on the part of the transferee. Section 6902, supra. Healy v. Commissioner, 345 U.S. 278 (1953); Coca-Cola Bottling Co. of Tucson, 37 T.C. 1006, 1011 (1962), aff'd. - F. 2d - (C.A. 9, July 13, 1964). To make out a prima facie case and discharge his burden, respondent must generally prove by competent evidence the following elements: (1) A prior existing tax liability of the transferor; (2) efforts to collect the tax from the transferor prior to the initiation of proceedings against the transferee, or that efforts to collect would be a useless gesture; (3) insolvency of the transferor before or as a result of the transfer, or that the transfer was in fraud of creditors; (4) that assets were transferred from the transferor to the alleged transferee for no consideration or an inadequate consideration; and (5) the value *118 of the assets transferred. Bartmer Automatic Self Service Laundry, Inc., 35 T.C. 317, 322 (1960); Arlington F. Brown, 24 T.C. 256, 266 (1955); C. A. Hutton, 21 B.T.A. 101, 103 (1930), aff'd 59 F. 2d 66 (C.A. 9, 1932). These elements are primarily factual and, therefore, in the final analysis we must seek the decision of this case in its particular facts. Smith v. Commissioner, 249 F. 2d 218 (C.A. 5, 1957), affirming a Memorandum Opinion of this Court. United States v. Hicks, 212 F. 2d 356 (C.A. 5, 1954). The record shows that petitioner's father and the transferor of the O/S Doctor Walling had unpaid income tax liabilities including additions to tax for fraud for the years 1943 and 1944 in the aggregate amount of $282,296.03. In 1954, a decision of this Court determined such liabilities. David J. Pleason, 22 T.C. 361 (1954), affd. 226 F. 2d 732 (C.A. 7, 1955), certiorari denied 350 U.S. 1006 (1956). Following the decision of the Court of Appeals in 1955, Pleason initiated efforts to compromise the aforesaid tax liabilities and furnished the respondent *119 a sworn statement of financial condition in which Pleason averred that he was insolvent on August 6, 1956, and, at all times material to this proceeding, he remained insolvent. Following a series of tax liens for delinquent income taxes against Pleason's assets, the Government instituted an action in 1959 in the United States District Court for the Northern District of Illinois with Anne Davis and David J. Pleason named as defendants. In the course of this action a Judgment Order was entered against Pleason in the amount of $395,966.72 for delinquent taxes and additions thereto. During the course of these proceedings, the only collections made totaled $4,179.20, which amount was credited against Pleason's tax liabilities. We think that the efforts undertaken by respondent are sufficient to establish that he made every reasonable effort to collect the amounts due from Pleason. Affirmative evidence of the transferor's liability, his insolvency and numerous efforts by the Government to collect the liability from the transferor, including the levies served and the liens filed, are set forth in detail in our Findings of Fact and we find no necessity for further comment here. From the foregoing *120 and the record as a whole, we are satisfied that the first three elements listed above have been established by the respondent. Bartmer Automatic Self Service Laundry, Inc., supra, p. 322. Specifically, with respect to Pleason's insolvency, we note that he made the transfer of the vessel after notice and demand and after liens were filed and levies served. Moreover, he made the transfer after he had stated in a sworn statement to the Government on August 6, 1956, in connection with an offer in compromise, that he was unable to pay the assessment and was insolvent. Likewise, the transferee concedes that she acquired the vessel on February 15, 1959, which is three days after a Notice of Levy with respect to her father's tax liabilities had been served on her. Meyer Fried, 25 T.C. 1241, 1244 (1956); Louise Noell, 24 T.C. 329-330 (1955), dismissed per curiam by stipulation of the parties, 234 F. 2d 665 (C.A. 8, 1956). We now turn to the more complicated factual question, however, of the nature of the transfer involved herein and whether or not petitioner secured the interest of the transferor for no consideration or less than *121 adequate consideration. The enrolled Bill of Sale shows a sale of the vessel by Kent directly to Anne Davis for a consideration of $31,000. Pleason's name does not appear in the chain of title of the aforesaid vessel. Said sale, however, was made in pursuance of a contract between Kent and Pleason (executed November 30, 1955) which specifically stated that Pleason was entitled to a bill of sale after payment of 60 percent of the purchase price of the vessel. By December 26, 1958, the transferor had paid approximately 65 percent of the purchase price. The balance due on the contract was $10,594.08. The transferor notified Kent that he "will have to have a bill of sale for which we [referring to Pleason and his agent, Webb] will give you a preferred ship mortgage." It is clear that Pleason actively negotiated with Kent for the transfer of title to the vessel on February 15, 1959. Under the terms of his contract, he was entitled to a bill of sale which he insisted be executed regardless of whether Kent accepted his new terms for paying the balance of the purchase price or continued their current arrangement. On February 15, 1959, Kent executed the formal "Bill of Sale of an Enrolled *122 Vessel." Pleason's name was not mentioned in said document. However, petitioner's name was inserted in the Bill of Sale and it was she who executed the first preferred ship mortgage for the unpaid balance of the purchase price required by the terms of Pleason's contract of sale. Significantly, although Anne Davis' name appears on all documents dated February 15, 1959, it was not until March 7, 1959, that Kent, after first noting that the "Buyer has performed his part of the contract, resolved to execute the bill of sale * * * to transfer said vessel to the Buyer, or the Buyer's appointee * * *." Manifestly, it was Pleason's payment of more than 60 percent of the purchase price of the O/S Doctor Walling under the contract that required Kent to perform. The record also shows that Pleason's attorneys were to prepare the bill of sale for execution by the officers of Kent and the choice of naming the enrolled buyer of the vessel for purposes of legal title was within the control of Pleason. In addition, it is noteworthy that the payments to be made by Anne Davis under the first preferred ship mortgage were exactly the same as those renegotiated by Kent and Pleason. In our opinion the *123 mere fact that Pleason's name was not in the chain of title does not establish that he did not have a beneficial interest in the vessel. The contract between Pleason and Kent and the payments by Pleason clearly establishes his beneficial interest in the vessel. Unquestionably, it was the transferor who caused his right to title in the vessel to be conveyed to his daughter, Anne Davis, and the transferor conveyed his beneficial interest in the vessel to petitioner at the same time. Suffice it to say, the close family relationship of petitioner and the transferor invites close scrutiny of the transaction. Viewing the transaction in its entirety, and particularly the continuing efforts of the Government to levy on Pleason's assets, we believe that the transferor avoided having his name entered on the records of the Bureau of Customs as the owner of the vessel in order to delay and hinder the Government in its endeavor to satisfy its claim for delinquent taxes. Under the circumstances, we are satisfied that petitioner secured the interests of the transferor without consideration or less than fair and adequate consideration. With respect to the element of valuation, which he must also *124 establish, respondent contends that the fair market value of the vessel on the date of the transfer was $27,500, and that the transfer of Pleason's interest was effected without adequate consideration. Respondent has conceded, on brief, that the transferor's beneficial interest in the vessel on the date of transfer was limited to $16,905.92, the difference between the alleged fair market value of the vessel of $27,500 and the $10,594.08 mortgage to Kent assumed by petitioner. In support of respondent's valuation (i.e., $27,500) of the vessel on the date of transfer, respondent has shown that this was the selling price of the vessel on February 20, 1959, negotiated by petitioner and E. J. Williams on February 20, 1959, five days after she had received through her father his interest in the vessel and his right to title. Williams was not related to petitioner and it appears that Williams was an experienced "shrimper," that is, he agreed to pay $27,500 for a vessel that was to be the basis of his livelihood. The contract of sale between Anne Davis and Williams was at arm's-length and the value determined in such an arm's-length transaction is probative evidence of the fair market value *125 of the asset in question. Also, the proximity of the date of sale to Williams to the date of transfer (February 15, 1959) adds further weight to the correctness of that valuation. Respondent also introduced contracts of marine insurance predicated on independent appraisals made approximately three months prior to and nine months following the date the vessel was transferred to petitioner. These estimates show that the vessel in question was valued for insurance purposes at $30,000 in 1958 and $25,000 in 1959, and these estimates are consistent with our own view. When Pleason purchased the vessel he obtained a marine insurance policy. The insurer caused an appraisal to be made of the vessel's condition and value. A "Condition and Appraisal" survey was obtained by the insurer on November 19, 1959, which shows that the "present market value after depreciation" of the O/S Doctor Walling is in the amount of $30,000. Approximately nine months after the date the vessel was transferred to petitioner, the vessel was appraised for insurance purposes for the period December 1, 1959, through December 1, 1960, and at that time the fair market value, after depreciation of the vessel, was found *126 to be in the amount of $25,000. Pleason was a party to a marine insurance contract supported by an independent valuation report and the petitioner was a party to an arm's-length sale of the vessel. If the fair market value of the vessel on the transfer date was less than $27,500, as urged by petitioner, it is incumbent upon her to overcome the values established by either the valuation report or the purchase price agreed upon in her contract of sale. Petitioner has failed to prove her position in this respect. Fada Gobins, 18 T.C. 1159, 1169 (1952), affd. per curiam 217 F. 2d 952 (C.A. 9, 1954). Furthermore, approximately one year after petitioner had received the O/S Doctor Walling she was a party to a suit filed against the insurer of the vessel for the face amount of the policy, that is, $25,000. In the pleadings filed in the admiralty action, petitioner averred that the "policy of insurance stipulated and agreed that the said vessel was valued in the sum of $25,000 for the purpose of insuring it." We find no merit in petitioner's argument, on brief, that if the vessel were seized by respondent and sold at auction, the sale would result in a "very *127 small realization." Fair market value is not measured by a hypothetical forced sale, as petitioner urges. Fair market value has been concisely defined as the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell and both being reasonably informed as to all relevant facts. O'Malley v. Ames, 197 F. 2d 256-257 (C.A. 8, 1952); Singer v. Shaughnessy, 198 F. 2d 178 (C.A. 2, 1952). With respect to the valuation of the transferred vessel, petitioner contends that there were certain outstanding maritime claims (i.e., for fuel, food and repairs) against the shrimp boat, which liabilities were also assumed by her and constituted consideration for its transfer by Pleason. Petitioner avers that the proceeds of certain checks, in the aggregate amount of $6,500, drawn by her were used to pay the debts of her father which he allegedly incurred in the operation of the vessel and, therefore, the total amount represented by these checks should be considered a part of her consideration *128 for the transfer of the vessel. Up to this point, in our opinion, respondent has established a prima facie case, including convincing evidence of the value of the asset transferred. The burden of going forward thereupon shifted to petitioner. It is petitioner's burden to adduce further evidence concerning the existence of additional liabilities outstanding against the vessel which were allegedly assumed by the transferee. We do not believe petitioner has met her burden in this respect. Fada Gobins, supra, p. 1169, and cases cited therein. Meyer Fried, 25 T.C. 1241, 1244 (1956); Estate of Henry Miller, 42 T.C. 593 (1964). Insofar as there is any evidence in the record of such additional liabilities assumed by petitioner, it is unconvincing. The record shows that operating expenses of the vessel were generally paid by Laurent Webb who acted as the ship's accountant in Pleason's and petitioner's behalf. The vessel was producing shrimp during most of this period and it seems reasonable to infer that any operating expenses could have been met out of the proceeds of the shrimp produced. In fact, Kent was to be paid 25 percent of the proceeds *129 from the shrimp produced by the vessel and it appears that regular payments were made to Kent by Pleason. In the absence of evidence to the contrary, we believe that the remaining 75 percent of the proceeds from the shrimp catch was available to pay operating expenses of the vessel. In support of her contention that she gave her father adequate consideration for the vessel, petitioner argues that she sent him four checks totaling $6,500 in order to meet outstanding liabilities of the vessel. These checks were made payable to the order of Pleason and were drawn on petitioner's bank account in Chicago. The first two of these checks, dated December 15, 1958, and January 10, 1959, in the respective amounts of $2,500 and $1,000, were seized under a Notice of Levy, when deposited in the "Boat Account" in the First National Bank of Brownsville. While the two checks were endorsed by Pleason to the account of the "Dr. Walling, L. Webb Acct.," there is no satisfactory evidence that they were in payment of any liability due Pleason by petitioner, or arose under the terms of any agreement between the two, or were other than voluntary payments by her to Pleason. Much the same may be said of the *130 latter two checks dated January 29, 1959, and March 10, 1960, in the amounts of $2,000 and $1,000, respectively, endorsed by Pleason. There is no acceptable evidence that the checks were other than gratuitous and there is no affirmative evidence as to the disposition of these funds. Indeed, the last check ($1,000) was drawn after petitioner had secured the $3,000 down payment from Williams on her contract of sale with him, and the record is not clear as to whether or not this amount was used, in part, by her to cover her last check to Pleason. Both checks are endorsed by Pleason and one, dated March 10, 1960, was drawn about one month after the vessel had become a total loss. In sum, the record does not support petitioner's contention that the four checks totaling $6,500, payable to her father, were intended as consideration for the transfer to her of his beneficial interest in the O/S Doctor Walling. Significantly, petitioner does not urge that there was any agreement or understanding with Pleason concerning any money that she advanced to him to meet his obligations. Apart from petitioner's vague and unconvincing testimony, there is no affirmative evidence to corroborate her assertion *131 respecting the maritime liens against the vessel, or that any checks given to Pleason were applied to satisfy liabilities incurred by the vessel for its operation. Petitioner did not introduce any bills or invoices (relating to the purported indebtedness of the vessel) which had been paid with the checks she allegedly gave her father for that purpose. Petitioner testified that she never received an itemized accounting from Webb respecting the maritime expenses paid, and that she did not have records available to substantiate the existence of claims against the vessel. Petitioner also failed to present Webb's records to corroborate her testimony as to the use of the proceeds of the four checks in question. Under the circumstances, we believe that petitioner's failure to call Webb as a witness creates the inference that his testimony would be unfavorable. The Wichita Terminal Elevator Co. v. Commissioner, 162 F. 2d 513 (C.A. 10, 1947), affirming, 6 T.C. 1158, 1165 (1946). In the absence of any affirmative evidence, such as invoices or paid bills, we are not convinced that Anne Davis assumed any liabilities against the vessel other than the mortgage owing *132 to Kent of $10,594.08. Nor can we assume that the proceeds of the aforesaid checks served as a valid consideration for the transfer if they were merely used for Pleason's living or other personal expenses. See Fada Gobins, 18 T.C. 1159, 1170 (1952), affd. per curiam 217 F. 2d 952 (C.A. 9, 1954). In view of the foregoing, we do not believe that petitioner has established that she assumed any liabilities outstanding against the vessel other than the mortgage obligation for which respondent has given her credit. Issue 2. Running of Interest Upon Transfer With respect to the applicable rate and starting date of the running of interest upon the transfer in controversy, respondent contends, on brief, that interest is chargeable to petitioner from the date of transfer, February 15, 1959, rather than from June 10, 1960, the date of the notice of deficiency of transferee liability. It is now settled that the liability, at law or in equity, of a transferee of property of a taxpayer, as referred to in section 6901, supra, is to be determined by reference to state law. See Commissioner v. Stern, 357 U.S. 39 (1958), where the United States Supreme *133 Court emphasized that section 311 of the 1939 Code (the predecessor section of section 6901, supra) neither creates nor defines a substantive liability, but provides merely a new procedure by which respondent may collect taxes once transferee liability has been established. The Supreme Court also stressed the view that the rights of the respondent as a creditor depended upon and should be determined by reference to state law. In considering the rights of the respondent under state law to impose transferee liability on the recipient of the transferred assets, and the extent of such liability, it has been held that where the transferee, as here, receives assets insufficient to satisfy the transferor's total Federal tax liabilities, including interest, determination of the existence, starting date, and rate of interest upon the retention of those assets prior to demand therefor, are controlled by state law. Estate of Samuel Stein, 37 T.C. 945, 960 (1962). The basis for this holding is that it is appropriate in these particular circumstances to look to state law for the right to *134 collect interest from the transferee based upon the wrongful use of those assets by the transferee prior to payment of the transferee liability involved. See Leo L. Lowry, 35 T.C. 393, 397 (1960). Included in respondent's right to impose transferee liability on the recipient of transferred assets is the right to impose interest on the value of the assets received in the same manner as any deficiency upon sending the statutory notice to the transferee. See Patterson v. Sims, 281 F. 2d 577 (C.A. 5, 1960); sections 6601 and 6901, supra, and their 1939 Code counterparts, sections 294(b) and 311. In the instant case, the residence of the transferor in Texas, the location of the vessel in Texas, and the fact that the transferor's contract of purchase was executed in and was performable in Texas are elements bearing the closest connection to the transaction and the intention of the parties to the transfer which provide the basis of the choice of Texas law. Hence, the principle expressed in Stern, supra, with respect to the determination of the existence of transferee liability applies with equal force to the proposition that the law of the State *135 of Texas controls the starting date and rate of interest. Estate of Samuel Stein, supra, p. 960. Under Texas law, applicable herein, if a transfer involves a fraud upon the creditors of the transferor the transfer is void as to those creditors. Vernon's Ann. Rev. Stat., Art. 3996, [3] (1945). The record shows that petitioner was fully cognizant of the Government's claims on the assets of the transferor and, by the same token, the transferor was aware also. A transferee can hardly be a bona fide purchaser if he acquires property subject to a perfected lien of which he is deemed to have constructive if not actual notice. Vernon's Ann. Rev. Stat., Art. 3996 (1945). In Glenney v. Crane, (Tex. Civ. App. 1961), 352 S.W. 2d 773, the Court held that a conveyance made with actual intent to hinder, delay or defraud creditors, even though valuable consideration is paid, is void if the grantee knows of the grantor's fraudulent purpose.
*136 The Revised Civil Statutes of Texas also provide as follows: Art. 3997. Voluntary conveyance Every gift, conveyance, assignment, transfer or charge made by a debtor, which is not upon consideration deemed valuable in law, shall be void as to prior creditors, * * *. In interpreting the aforesaid article of the Texas Statutes, it was held in Hunter v. Pitcock (Tex. Civ. App. 1961), 346 S.W. 2d 509, that, under the circumstances there presented, the trial court was at liberty to hold the transactions on the part of the assignor to have been in fraud of his creditors under Art. 3996 and Art. 3997 of Vernon's Ann. Rev. Tex. Civ. Statutes. See also Paddock v. Jackson, (Tex. Civ. App. 1897), 41 S.W. 700, where the Court held that the parties to a conveyance are held to have contemplated the consequences of their act, and that this constitutes the fraudulent intent which vitiates the conveyance. In essence, it is respondent's position with respect to the running of interest that the transfer to Anne Davis was a fraudulent conveyance under Texas law, petitioner *137 being well aware of her father's insolvency and prior demands upon him by respondent for his tax liabilities. We believe that the evidence relating to petitioner's knowledge of respondent's efforts to obtain satisfaction from the transferor with respect to his delinquent tax liability for the years 1942 and 1943 is sufficient to establish the mala fides of the transaction under review. Moreover, petitioner testified that two checks, which she had given to her father and which were deposited to his boat account a few months before she obtained title to the vessel, were seized under levy by the United States for delinquent income taxes. Also, on February 12, 1959, three days before she actually obtained title to the vessel in question, petitioner was served with a Notice of Levy by the Government with respect to any of her father's property in her possession. Manifestly, such overt action by the Government gave petitioner ample notice of the existence of a debtor-creditor relationship between her father and the Government prior to the transfer of the vessel in her name. We are convinced that Pleason engineered the transfer of his interests in the shrimp boat after the determination *138 by this Court of the amount of his deficiencies in income taxes and additions thereto; after the assessment of these deficiencies; after notice and demand for payment; after liens were filed and levies served, and after the transferor had declared his insolvency. Under the circumstances, in our view, respondent is entitled to interest from the date of the transfer of the vessel to petitioner as damages for the detention of amounts due and owing him as a creditor of the transferor, particularly when the knowledge of the grantee in the conveyance is evident. Vernon's Ann. Rev. Stat., Art. 3996 (1925). See Elizabeth Lewis Saigh, 36 T.C. 395, 430-431 (1961). It is noteworthy that under Texas law, which follows the majority view in the United States, a grantee who participated in a fraudulent conveyance is chargeable with rents and profits from the date of the transfer. Griffin v. McCullough Tool Co., (Tex. Civ. App. 1954), 265 S.W. 2d 131. We discern no basic difference between rents from land and interest on capital. Considering the foregoing principles and the *139 authorities cited, we conclude that Texas would charge interest from the date of the fraudulent transfer when both parties thereto have participated in actual fraud against the Government. Estate of Samuel Stein, supra, p. 962. See Patterson v. Sims, supra. In the light of the foregoing, and the record as a whole, we hold that petitioner is liable as a transferee to the extent of the transferor's beneficial interest in the vessel transferred to her in the amount of $16,905.92, together with interest thereon at 6 percent, as prescribed by Texas law from the date of the transfer, February 15, 1959. Vernon's Ann. Rev. Civ. Stat., Art. 5070 (1960). Issue 3. Statute of Limitations Petitioner, on brief, contends that the "notice of transferee liability, upon its face, is not within any statute of limitations." Petitioner's position appears to be that the notice of transferee liability was not issued until June 10, 1960, more than one year after the transfer of title to the vessel to her by Kent Shrimp Company, and, hence, the statute of limitations bars any assessment of tax against her as transferee. At the outset, we do not believe that the date of transfer of title *140 of the vessel to petitioner is germane to the issue of the statute of limitations where transferee liability is under review, and, therefore, find no merit in petitioner's position. Also, we note that petitioner has not presented any section of the revenue law or other authority for her position. While petitioner has not couched the issue of limitations in the context of section 6901 of the 1954 Code, for completeness and clarity of decision, we deem it desirable to discuss the issue herein within the purview of said statute. The applicable provision of the 1954 Code, section 6901 (the counterpart of section 311(b)(1) of the 1939 Code) reads as follows: SEC. 6901. TRANSFERRED ASSETS. * * *
(c) Period of Limitations. - The period of limitations for assessment of any such liability of a transferee or a fiduciary shall be as follows: (1) Initial transferee. - In the case of the liability of an initial transferee, within 1 year after the expiration of the period of limitation for assessment against the transferor; * * *
Applying section 6901, supra, to the facts herein, *141 we find that assessment may be made against Anne Davis only within one year after the expiration of the period of limitation for assessment against David J. Pleason, the transferor, and in resolving this question we must, therefore, look to the transferor and determine when assessment against him was barred, if at all, by the statute of limitations. In the case of David J. Pleason, 22 T.C. 361 (1954), affd. 226 F. 2d 732 (C.A. 7, 1955), certiorari denied 350 U.S. 1006 (1956), before the Tax Court, which decision has long become final, we found that Pleason filed false and fraudulent returns for the taxable years 1943 and 1944 with intent to evade tax. Section 276(a) of the 1939 Code provides: SEC. 276. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION - EXCEPTIONS. (a) False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time. * * *
Congress *142 apparently did not specifically and definitively deal with the problem here presented. However, when section 311(b)(1), supra, (the predecessor of section 6901, supra) and section 276(a) are read together, it is clear that the limitation period applicable to a transferee is directly geared to the period applicable to the transferor, and that since assessment may be made at "any time" against a taxpayer who files a fraudulent return, a transferee of such taxpayer may likewise be assessed at any time. Suspension of the statute as against the transferor (in a fraud or no-return case) works a suspension of the statute as to the transferee. Smith v. Commissioner, 249 F. 2d 218 (C.A. 5, 1957); First Nat. Bank v. Commissioner, 112 F. 2d 260 (C.A. 7, 1940), both affirming Memorandum Opinions of this Court; Amalgamated Sugar Co., 24 B.T.A. 143, 149-150 (1931). In our view the one-year period of assessment against a transferee is not measured from the date at which assessment actually has been made against the transferor but is computed from the date on *143 which assessment might be made against the transferor, which in the case of a taxpayer who files a fraudulent return is at "any time" under section 276(a), supra. In this connection, we note that section 311(b)(1), supra, sets the period of limitations within one year after the expiration of the period "for assessment" against the transferor, which in the case of a fraudulent taxpayer would mean at "any time" within the intendment of section 276(a). Moreover, the statutory period "for assessment" or the time limit in which respondent may make his assessment is not shortened because he has made an assessment against the transferor at an earlier date. Ann C. Field, 32 T.C. 187, 200 (1959); Will T. Caswell, 36 B.T.A. 816, 827, 828 (1937); E. B. Teague, 32 B.T.A. 641, 643 (1935); Commissioner v. Gerard, 78 F. 2d 485 (C.A. 9, 1935), affirming 28 B.T.A. 236 (1933). In Continental Oil Co. v. United States, 14 F. Supp 533 (Ct. Cl. 1936), certiorari denied 301 U.S. 694, the Court said (p. 538): The timeliness of an assessment against a transferee is in no way dependent on the date on which *144 assessment was made against the taxpayer, it being entirely immaterial whether such assessment was ever made. The requirement of the statutes is met if the Commissioner makes the assessment against a transferee within one year after the expiration of the date on which assessment could have been made against the taxpayer. We recognize, of course, that where an actual assessment has been made against a transferor it may be inconvenient for a transferee to be called upon by the Government after a year or more has elapsed to account for the assets of the transferor. However, we believe that the fraud of a transferor, as determined in a court proceeding, removes all time barriers to the assessment of the tax involved, and that the respondent should be afforded all the time required to track down a fraudulent taxpayer and his transferee in order to recover the delinquent revenue. Cf. United States v. Hardy, 299 F. 2d 600 (C.A. 4, 1962). In Ruth Halle Rowen, 18 T.C. 874 (1952), reversed on other grounds, 215 F. 2d 641 (C.A. 2, 1954), the respondent *145 had filed a jeopardy assessment against the taxpayer (transferor) on September 23, 1944. It was determined by this Court, in Louis Halle, 7 T.C. 245 (1946), that for the years 1929 to 1938, inclusive, Louis Halle owed income taxes and additions to tax for fraud. Our decision was appealed and affirmed by the Court of Appeals for the Second Circuit on June 1, 1949, 175 F. 2d 500, and certiorari was denied by the United States Supreme Court on February 6, 1950, 338 U.S. 949. Louis Halle died January 4, 1949, insolvent. On September 14, 1950, the respondent mailed a notice of transferee liability to the wife of Louis Halle. The transferee contended that the statute of limitations barred assessment of the transferee since no assessment was made against her within one year from the date of jeopardy assessment against the transferor. Holding that the statute of limitations was suspended as to the transferee under section 276(a), supra, we said ( Ruth Halle Rowen, 18 T.C. 874, 880): Thus, it will be seen that there is no statute of limitations which runs against the assessment of taxes and penalties where the taxpayer's returns were *146 false and fraudulent with intent to evade tax. In such a case, the statute provides that the Commissioner may assess the tax at "any time". Therefore, it seems clear that no statute of limitations has barred assessment against the transferor Louis Halle and it naturally follows that if assessment is not barred against the transferor, it likewise is not barred against the transferee. * * * United States v. Updike, 281 U.S. 489 (1930), is not here controlling since the Supreme Court disposed of the statute of limitations question without reliance on, or interpretation of, the phrase "any time" as used in section 278(a) and (d) of the 1926 Revenue Act (the predecessor of section 276, supra). Moreover, in Updike, which is a no-return case, the Supreme Court held that the six-year limitation on court proceedings to collect the tax was applicable to a suit to recover corporation taxes brought against stockholders as transferees of a defunct corporation's assets. The opinion did not predicate its conclusion on the basis of the statutory period for assessment. Hill Goldwater, 21 B.T.A. 73, 74-75 (1930). In the light of the foregoing, we hold that assessment *147 and collection of the liability of petitioner as transferee, in the amount determined by respondent, is not barred by the statute of limitations. Issue 4. Offset for Overpayment by Transferee Petitioner, in her petition, alleges that she is entitled to a setoff with respect to an overpayment of her individual income taxes for the fiscal years ending November 30, 1942, and November 30, 1944, in the amount of $49,884.93. Petitioner avers that said money was paid by her on the assumption that she was the owner of the business determined to be the property of her father by this Court in David J. Pleason, 22 T.C. 361 (1954). Respondent, in opposition, filed a (second) motion to strike for lack of jurisdiction certain paragraphs of the petitioner relating to the aforesaid overpayment and setoff, which motion we have granted. However, as the parties have argued the issue on brief, and for the sake of completeness, we consider the issue herein. Section 6214(b) of the Internal Revenue Code of 1954 provides, in pertinent part, as follows: SEC. 6214. *148 DETERMINATIONS BY TAX COURT. * * *
(b) Jurisdiction Over Other Years. - The Tax Court in redetermining a deficiency of income tax for any taxable year or * * * shall consider such facts with relation to the taxes for other years as may be necessary correctly to redetermine the amount of such deficiency, but in so doing shall have no jurisdiction to determine whether or not the tax for any other year has been overpaid or underpaid. See section 272 of the 1939 Code which is substantially the same. We think it is clear that the jurisdiction of this Court in transferee liability cases is concerned exclusively with the secondary liability of the transferee for the taxes of another, that is, the transferor, and our jurisdiction does not extend in such action to the individual or personal tax status of the transferee. Estate of Samuel Stein, 40 T.C. 275 (1963); Vandenberge v. Commissioner, 3 T.C. 321 (1944), affd. 147 F. 2d 167 (C.A. 5, 1945), certiorari denied 325 U.S. 875 (1945); Isaac Michael Green 26 B.T.A. 719 (1932). Cf. Pleason v. Commissioner, 226 F. 2d 732 (C.A. 7, 1955), affirming 22 T.C. 361 (1954). *149 The letter received by Anne Davis provided only that a "recommendation" will be made for the issuance of the certificate of overassessment should she fail to file an acceptance of the proposed adjustments or a written protest. Petitioner did nothing in response to this letter. Also, the respondent did not issue a certificate of overassessment. Petitioner, however, has asserted as a setoff against her transferee liability, as determined by respondent, the overpayment of her income taxes for the fiscal years ended November 30, 1942, and 1944. In order for us to make a finding that petitioner is entitled to a setoff, a determination would have to be made that there are overpayment of income taxes for the aforesaid taxable years. However, since these years are not before the Court, we lack the proper jurisdiction to make such a determination. Commissioner v. Gooch Co. 320 U.S. 418 (1943). Decision will be entered under Rule 50. Footnotes
1. SEC. 6901. TRANSFERRED ASSETS. (a) Method of Collection. - The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred: (1) Income, estate, and gift taxes. - (A) Transferees. - The liability, at law or in equity, of a transferee of property - (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes), * * *
(b) Liability. - Any liability referred to in subsection (a) may be either as to the amount of tax shown on a return or as to any deficiency or underpayment of any tax. (c) Period of Limitations. - The period of limitations for assessment of any such liability of a transferee or a fiduciary shall be as follows: * * *
(e) Period for Assessment Against Transferor. - For purposes of this section, if any person is deceased, or is a corporation which has terminated its existence, the period of limitation for assessment against such person shall be the period that would be in effect had death or termination of existence not occurred. (f) Suspension of Running of Period of Limitations. - The running of the period of limitations upon the assessment of the liability of a transferee or fiduciary shall, after the mailing to the transferee or fiduciary of the notice provided for in section 6212 (relating to income, estate, and gift taxes), be suspended for the period during which the Secretary or his delegate is prohibited from making the assessment in respect of the liability of the transferee or fiduclary (and in any event, if a proceeding in respect of the liability is placed on the docket of the Tax Court, until the decision of the Tax Court becomes final), and for 60 days thereafter. * * *
(h) Definition of Transferee. - As used in this section, the term "transferee" includes donee, heir, legatee, devisee, and distributee, and with respect to estate taxes, also includes any person who, under section 6324(a)(2), is personally liable for any part of such tax. * * *↩
2. The Commissioner has the burden of proof to establish the liability of a transferee. SEC. 6902. PROVISIONS OF SPECIAL APPLICATION TO TRANSFEREES. (a) Burden of Proof. - In proceedings before the Tax Court the burden of proof shall be upon the Secretary or his delegate to show that a petitioner is liable as a transferee of property of a taxpayer, but not to show that the taxpayer was liable for the tax. * * *↩
3. The Revised Civil Statutes of Texas provide as follows: Art 3996. Conveyance to defraud Every gift, conveyance, assignment, or transfer of, * * * any estate real or personal, * * * given with intent to delay, hinder or defraud creditors, * * * shall, as to such creditors, * * * be void. This article shall not affect the title of a purchaser, for valuable consideration, unless it appear that he had notice of the fraudulent intent of his immediate grantor, * * *.↩